Jonathan A. Dessaules, State Bar No. 019439
Douglas M. Imperi, Jr., State Bar No. 034708
**DESSAULES LAW GROUP**
5343 North 16th Street, Suite 200
Phoenix, Arizona 85016
Tel. 602.274.5400
Fax 602.274.5401
jdessaules@dessauleslaw.com
dimperi@dessauleslaw.com

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jennifer Saint Patrick,<br><br>Plaintiff,<br><br>vs.<br><br>RHI 1 San Norterra, LLC; Mark-Taylor Residential, Inc.; Logen Watts; and Tracy Mendoza,<br><br>Defendants. | No. 2:22-cv-00462-DLR<br><br>**PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRIAINIGN ORDER AND ORDER TO SHOW CAUSE** |

Per Fed. R. Civ. P. 65(b), Plaintiff Jennifer Saint Patrick ("Saint Patrick") hereby applies to this Court for a temporary restraining order ("TRO") and an order to show cause why a preliminary injunction should not issue. Saint Patrick seeks to enjoin Defendants from taking any actions to evict Saint Patrick, remove her from her home, or raise her rent. Following Rule 65(b)(1)(B), a certified account of Saint Patrick's efforts to notify Defendants of this application accompanies this filing.

## INTRODUCTION

Without the Court's immediate intervention, Saint Patrick, a 70% disabled veteran, is at risk of being homeless. Defendants sent her a 30-day notice to terminate her tenancy just over a month after she filed a Fair Housing Act ("FHA") complaint against Defendants. The FHA complaint was precipitated by months of Defendants refusing to make reasonable

accommodations for her and ignoring her complaints about disability-based harassment. Rather than help a person with disabilities, Defendants chose to get rid of her. Defendants' behavior violates the FHA and interferes with Saint Patrick's exercise of rights under the FHA. So, a TRO and preliminary injunction are necessary to prevent irreparable harm and protect Saint Patrick's rights.

## BACKGROUND

Saint Patrick is a disabled veteran who suffers from Postural Orthostatic Tachycardia Syndrome (also known as "POTS"), Bilateral Upper Body Tremors (hand tremors), Chronic Regional Pain Syndrome of the Extremities (also known as "CRPS"), and her mobility is handicapped. [Ver. Complaint ¶ 8; Exh. A; Exh. B] Her disabilities affect her ability to walk, manipulate objects, and keep her balance. [Ver. Complaint ¶ 9; Exhs. A-C] She is also immunocompromised due to her disabilities. [Ver. Complaint ¶ 17; Exh. A]

San Norterra Apartments ("San Norterra") is an apartment complex located at 28515 N. North Valley Parkway, Phoenix, AZ 85085. [Exhs. D-E] Saint Patrick currently lives at Unit 1117 of San Norterra ("Unit 1117"). [Ver. Complaint ¶ 1; Exh. D] Defendant RHI 1 San Norterra, LLC ("RHI") is the legal owner of San Norterra. [Exhibit E] Defendant Mark-Taylor Residential, Inc. ("Mark-Taylor") is RHI's property manager and manages San Norterra. [Ver. Complaint ¶ 3; Exh. D] Defendant Logen Watts is the Community Manager for San Norterra and Mark-Taylor's agent. [Ver. Complaint ¶ 4] Defendant Tracy Mendoza is the Director and Residential Manager for Mark-Taylor, and she supervises Watts. [Ver. Complaint ¶ 5]

### A. Saint Patrick's Requests for Reasonable Accommodations

In 2017, Saint Patrick informed Mark-Taylor that she was a disabled veteran so it could include her disability compensation when evaluating her rental application. [Ver. Complaint ¶ 12] Mark-Taylor charged Saint Patrick a $250 pet fee and $35 a month for pet rent for her service dog, Max. [Ver. Complaint ¶ 16; Exhs. D, F] Soon after signing her first lease, Saint Patrick requested and obtained a reasonable accommodation to use an electronic leash for Max [Ver.

Complaint ¶ 17; Exh. G] In order to obtain the accommodation, Saint Patrick sent ADA medical documentation to Mark-Taylor saying she has POTS; the condition is permanent; and it limits her ability to sit, stand, lift, and perform manual tasks. [Ver. Complaint ¶ 18; Exh. C] Around July 14, 2018, she sent another ADA Accommodation Letter to Mark-Taylor that supplied specific medical documentation for her service dog. [Ver. Complaint ¶ 21; Exh. B]

Around April 2019, Saint Patrick injured her left wrist [Ver. Complaint ¶ 22; Exh. H] That same month, Mark-Taylor implemented a mandatory Valet Trash Service, where tenants would pay $35 a month for a service to pick up trash and recycling at the tenant's doorstep [Ver. Complaint ¶ 23] Saint Patrick could not compact all her boxes [Ver. Complaint ¶ 24; Exh. H] Specifically those boxes that were glued or stapled, but the valet service collected all her trash anyways. [*Id.*] Around November 30, 2020, Saint Patrick had surgery on her injured left wrist. Subsequently, Saint Patrick was in occupational therapy for over five months and diagnosed with CRPS. [Ver. Complaint ¶ 26; Exh. H] On or about May 12, 2021, Mark-Taylor stopped taking Saint Patrick's recycling, even though she was still paying for the mandatory valet trash service [Ver. Complaint ¶ 37; Exh. I]

On May 17, 2021, Saint Patrick filed a maintenance request to have Mark-Taylor pick up her recycling [Ver. Complaint ¶ 38; Exh. I] The next day, Watts emailed Saint Patrick to allege she was in violation of her lease for not breaking down boxes and the trash valet would not take them [Ver. Complaint ¶ 39; Exh. J] That same day, Saint Patrick met with Watts and showed her the scars on her wrist from her surgery and explained that she could not physically break down the cardboard boxes. [Ver. Complaint ¶ 40] Saint Patrick asked Watts to waive the requirement to break down the boxes as a reasonable accommodation [Ver. Complaint ¶ 41] Watts agreed. [*Id.*]

On May 24, 2021, Saint Patrick emailed Watts to, again, request that the trash valet take her uncompacted boxes. [Ver. Complaint ¶ 42; Exh. J] The trash valet took her neighbor's recycling, and the recycling dumpster contained many uncompacted boxes. [Ver. Complaint ¶ 42;

Exh. K, ¶ 34] Saint Patrick also requested a refund of that month's $35 valet trash fee and a refund of the pet rent she paid for her service dog. [Ver. Complaint ¶ 42; Exh. J] Inexplicably, Watts reversed course and denied Saint Patrick's requests for reasonable accommodation. [Ver. Complaint Exh. ¶ 43; Exh. J]

On May 27, 2021, Saint Patrick emailed Mendoza to ask that Mark-Taylor take her boxes without requiring her to break them down. [Ver. Complaint ¶ 44; Exh. J] Saint Patrick also supplied medical documentation from her occupational therapist that specifically stated Saint Patrick is unable to break down boxes—she lacks normal grip strength and has very limited use of her hands due to the pain she experiences from gripping or using force. [Ver. Complaint ¶ 44; Exhs. J, L-M] Saint Patrick also requested a refund of her pet rent paid to date and supplied another copy of the 2018 ADA Accommodation Letter. [Ver. Complaint ¶ 44; Exh J]

On May 28, 2021, Colin Clark, counsel for Mark-Taylor, wrote to Saint Patrick to say Mark-Taylor is denying her requests for a reasonable accommodation regarding pet rent for her service animal and the valet trash service. [Ver. Complaint ¶ 45; Exh. N, pp. 1-2] In Clark's letter, he also, unprompted, offered to let Saint Patrick terminate her lease early in exchange for her waiving her claims against Mark-Taylor. [Ver. Complaint ¶ 46; Exh. N, pp. 2-3] Saint Patrick never asked to terminate her lease. [Exh. K ¶ 39]

### B. Defendants Ignore Saint Patrick's Complaints About Disability-Related Harassment.

In December 2020, a tenant from Unit 1009 stalked Saint Patrick and Max for several blocks, even as Saint Patrick took several turns to avoid the tenant and her barking dog [Ver. Complaint ¶ 27] Saint Patrick reported the December incident to Mark-Taylor [Ver. Complaint ¶ 28] In April 2021, Saint Patrick told Mark-Taylor about another tenant who was threatening to fight her, stalking her around the community, and standing at her door just to intimidate her [Ver. Complaint ¶ 30] Mark-Taylor directed Saint Patrick to call the police, which she did [Ver. Complaint ¶ 31] Watts asked Saint Patrick to supply a formal write-up of the incident [Ver.

Complaint ¶ 32] Saint Patrick sent her formal write-up, which included medical documentation that reiterated her disability "impacts every aspect of her life," that she is immunocompromised, and made clear that the other tenant was a threat to her health and safety.. [Ver. Complaint ¶ 33; Exh. O] Soon after, two tenants from Unit 1009, with their dogs, began following Saint Patrick and Max around the community. [Ver. Complaint ¶ 34] Saint Patrick reported the stalking as disability-related harassment to Mark-Taylor, but Mark-Taylor refused to intervene or supply any information about the tenants so Saint Patrick could pursue her own remedies. [Ver. Complaint ¶¶ 35 & 36; Exh. O]

**C. Saint Patrick Files an FHA Complaint**

On November 17, 2021, Saint Patrick filed a complaint with the United States Department of Housing and Urban Development ("HUD") concerning Mark-Taylor's refusal to provide her with reasonable accommodations. [Ver. Complaint ¶ 47; Exh. P] In the HUD complaint, Saint Patrick specifically noted that Mark-Taylor would not take her trash [Exh. P, pp. 3-4] HUD supplied a copy of Saint Patrick's complaint to RHI, Mark-Taylor, Watts, Mendoza, and Clark [Exh. P, p. 6] HUD assigned Saint Patrick's complaint to the City of Phoenix Equal Opportunity Departments, where the complaint is still being investigated. [Ver. Complaint ¶ 49; Exh. Q]

**D. Defendants Terminate Saint Patrick's Lease**

On January 29, 2022, Saint Patrick received a 30-day notice (dated January 11, 2022) from Watts informing her that Mark-Taylor was electing to terminate her tenancy and not renewing her lease [Ver. Complaint ¶ 51; Exh. R] The notice gave no explanation as to why Mark-Taylor would not renew the lease [*Id.*] Before Saint Patrick filed her HUD complaint, she never had an issue renewing her lease and did so, without issue, from 2017 to 2021 [Ver. Complaint ¶ 14; Exhs. D and S]

Dr. David Saperstein, who is Board-certified in Neurology, has opined that forcing Saint Patrick to move would pose an "undue burden" and have "a high risk of complications" due to "her already complex health conditions." [Exh. A] Specifically, Dr. Saperstein states:

> Saint Patrick's [POTS] and [CRPS] would likely progress with the stress of potential eviction and the physical impact of the involuntary move-out itself: 1) the patient's POTS condition has already progressed to include a compromised immune system (homebound since 2018) as well as spontaneous paralysis that may become more persistent or even continuous; 2) Meanwhile, her CRPS condition, is also impacted by stress (emotional or physical) as such the extensive repetitive motion activities and/or weight bearing tasks will trigger a detrimental effect on her condition with likely additional long-term impairment.

[*Id.*] He also said that Saint Patrick's disabilities put her at a high risk of developing severe illnesses if she contracts COVID-19. [*Id.*] Further, Saint Patrick's only source of income is her limited disability compensation. [Exh. T] Accordingly, moving would cause irreparable harm.

**E. Defendants Raise Saint Patrick's Rent by 20%**

On March 18, 2022, Saint Patrick sent Defendants a letter requesting that it provide a reasonable accommodation to extend her rental agreement, just as Defendants have with able-bodied tenants. [Exh. U] On March 24, 2022, Saint Patrick sent Defendants a copy of her Verified Complaint, which reiterated her numerous FHA claims, provided additional medical documentation, and mentioned that she faced the prospect of homelessness. [Ver. Complaint ¶ 75] On March 25, 2021, Mark-Taylor stated that it would accommodate Saint Patrick, but it would put her on a month-to-month lease with a 60-day window to reevaluate. [Exh. V] Under the terms of the lease, a lease term automatically becomes month-to-month after the original lease term and continues until written notice is given 60-days prior to termination. [Exh. D ¶ 4] So, Defendants proposed accommodation is really no accommodation at all. Further, once the tenancy becomes month-to-month, Defendants can charge an added 20% of the tenant's rent each month. [*Id.*] As shown by Saint Patrick's latest billing statement, Defendants have already started charging her an added 20% for rent. [Exh. W] Prior to this rent hike, Defendants only raised Saint Patrick's rent by about 3.82% from year to year. [*See* Exh. D & S (raising rent from $1,600 a month in 2020 to $1,675 a month in 2021)] Defendants refusal to renew Saint Patrick's lease make it impossible for her to obtain a new service dog because she must provide proof of stable housing to obtain one. [Exh. K ¶ 48]

## ARGUMENT

The purpose of a TRO "is to preserve the status quo before a preliminary injunction hearing may be held." *Arizona Recovery Housing Ass'n v. Arizona Dep't of Health Services*, 462 F. Supp. 3d 990, 996 (D. Ariz. 2020). While the purpose of a preliminary injunction "is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered." *Id.* (internal citations omitted). The standards for obtaining a TRO are "essentially identical to the standard for a preliminary injunction." *Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150 (D. Or. 2020). Thus, a court should issue a TRO or preliminary injunction if the plaintiff shows: (1) she is likely to succeed on the merits; (2) she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in her favor; and (4) an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). When proof of one of the elements is weak, a strong showing on another element can offset it. *Arizona Recovery Housing Ass'n*, 462 F. Supp. 3d at 997 (using the example that if a party could not show a likelihood of success on the merits but could show there were "serious questions going to the merits," it could still receive preliminary relief if it showed the balance of hardships weighed sharply in its favor.").

All the elements weigh heavily in Saint Patrick's favor. She faces immediate irreparable harm due to the impact of a forced move and homelessness. She presents a strong FHA case showing Defendants are discriminating against her in response to her requests for reasonable accommodations and filing an HUD complaint against them. Equity favors granting the injunctive relief since Saint Patrick would be homeless without it and Defendants would suffer no loss if the Court granted it. And public policy strongly supports preventing FHA violations and discrimination, not encouraging it. Thus, a TRO should issue, followed by a preliminary injunction.

### A. Saint Patrick Faces Imminent and Irreparable Harm.

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction

is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." 11A Charles Alan Wright et al., Fed. Prac. & Proc. § 2948.1, at 129 (3d ed. 2013). "[I]t is well-established that the loss of an interest in real property constitutes an irreparable injury." *Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1159 (9th Cir. 2011) (listing eviction and foreclosure cases). Eviction from a person's home constitutes irreparable harm that justifies the issuance of a preliminary injunction. *Mitchell v. U.S. Dept. of Housing and Urban Development*, 569 F. Supp. 701, 704-05 (N.D. Cal. 1983) (defendant refused to renew the plaintiff's lease and sought to evict her when she did not leave). The harm was "irreparable" in *Mitchell* because the plaintiff was unlikely to find other affordable housing and there is a scarcity of public housing. *Id.* Similarly, in *Johnson v. Macy*, the court found that an eviction would irreparably harm the plaintiff because it would be disruptive to her life and a wrongful eviction has no adequate remedies at law to address that harm. 145 F. Supp. 3d 907, 920 (plaintiff said she developed strong ties in the community and would be homeless if evicted).

In this case, Saint Patrick faces imminent and irreparable harm from an eviction. Mark-Taylor has already indicated it will not renew her lease when it expires on April 13, 2022 [Exh. R]. Further, Mark-Taylor's notice to Saint Patrick states "NOTICE IS FURTHER PROVIDED that in the event that you fail to vacate the premises by the expiration of your lease agreement as described above, Management and/or Owner will immediately commence an action in Special/Forcible Detainer to seek an award of possession of the premises and any damages pursuant to your lease agreement. . ." [*Id.* (emphasis in original)] Thus, it is not merely hypothetical that Saint Patrick will be evicted, Mark-Taylor has informed her that it is imminent. Now, Mark-Taylor is forcing Saint Patrick, who is immunocompromised, to seek out replacement housing during the Covid-19 pandemic with meager disability compensation. She is unlikely to find suitable replacement housing. As Dr. Saperstein opined, moving would also expose her to

significant health risks and would be detrimental to her POTS and CRPS impairments. Quite literally, Saint Patrick's life would be at risk if she is forced to move.

While Defendants have suggested they are willing to accommodate her and allow her to remain on a month-to-month lease, that is not an accommodation. The lease automatically becomes month-to-month at the expiration of the lease term. Now, Defendants are charging her an additional 20% in rent. Ms. Saint Patrick lives off disability income and does not have the means to pay 20% more in rent. [Exh. K ¶ 46] Defendants are effectively evicting her by putting her in a position where she cannot afford rent. Defendants' constructive eviction under the guise of an "accommodation" is deceptive, discriminatory behavior that will cause Saint Patrick to suffer irreparable harm.

There are no remedies at law that could adequately address this harm if this Court does not enjoin Defendants and allows them to evict Saint Patrick. Thus, this element tips sharply in Saint Patrick's favor.

**B. Saint Patrick Will Likely Succeed on Her FHA Claims**

"One moving for a preliminary injunction assumes the burden of demonstrating either a combination of probable success and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor." *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*, 526 F.2d 86, 88 (9th Cir. 1975) (quoting *Charlie's Girls, Inc. v. Revlon, Inc.*, 483 F.2d 953, 954 (2d Cir. 1973). "It is not necessary . . . that the moving party be reasonably certain to succeed on the merits. If the harm that may occur to the plaintiff is sufficiently serious, it is only necessary that there be a fair chance of success on the merits." *Id.* (quoting *C. Tennant & Sons, Inc. v. New York Terminal Conference*, 299 F. Supp. 796, 799 (S.D.N.Y. 1969)).

The FHA prohibits persons from discriminating "in the sale or rental, or otherwise make unavailable or deny, a dwelling to any buyer or renter because of a [disability] of . . . that buyer or renter. . ." 42 U.S.C. § 3604(f)(1). It also prohibits discriminating "against any person in the

terms, conditions, or privileges of sale or rental of a dwelling, or in the provisions of services or facilities in connection with such dwelling, because of a [disability] of . . . that person . . ." 42 U.S.C. § 3604(f)(2). Under the FHA, the term "discrimination" includes a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). It is also illegal to "coerce, intimidate, threaten, or interfere with any person" who exercises their rights under the FHA. 42 U.S.C. § 3617.

Saint Patrick is likely to succeed on her FHA claims given Defendants refused to accommodate her and looked to evict her shortly after she filed a HUD complaint. Saint Patrick had no issues renewing her lease from 2017 to 2021. It was not until she requested reasonable accommodations for her service dog and valet trash service—and filed an HUD complaint when Defendants would not grant those reasonable accommodations—that Defendants refused to renew her lease. Defendants' refusal to grant accommodations, despite ample notice of her disabilities, would meet the definition of "discrimination" under the FHA. *See* 42 U.S.C. § 3604(f)(3)(B). In response to Saint Patrick's requests for reasonable accommodations, Mark-Taylor offered to terminate her lease early—even though she never requested this. And Saint Patrick received Mark-Taylor's notice of non-renewal just two months after she filed her HUD complaint. The circumstances strongly suggest that Defendants' refusal to renew Saint Patrick's lease was based on discrimination and meant to interfere with the exercise of her rights under the FHA.

Defendants continued this discrimination when it said it would allow Saint Patrick to stay on a month-to-month lease. Unlike other tenants who are allowed to renew their lease for a full year, just as Saint Patrick was previously allowed to do, Saint Patrick has an uncertain lease term. She now has to pay 20% ($335 a month) more in rent, which she cannot afford. *Accord Murphy v. Smallridge*, 196 W. Va. 35 (1996) (finding a landlord retaliated against his tenants by notifying them that their rent would increase by $150 a month if they stayed at the premises after the tenants complained to the state's Department of Natural Resources about the landlord dumping on the

property). And, although Defendants have suggested they would allow Saint Patrick to obtain a new service dog, she cannot because her housing situation is unstable. This is not a reasonable accommodation and it denies Saint Patrick, a disabled person, the terms, conditions, and privileges offered to able-bodied tenants.

Thus, she will likely succeed on the merits. At the very least, there are serious questions concerning Defendants' motivations in this case.

**C. Equity Favors Saint Patrick's Continued Occupation of Her Home**

The balance of hardships in this case tips overwhelmingly in Saint Patrick's favor. Saint Patrick faces the prospect of homelessness, severe illness, and disability complications if she is forced to move out of Unit 1117. On the other side, Defendants face no hardship whatsoever. Saint Patrick pays her rent on time, she has not violated her lease, and she has not caused any issues within San Norterra that would justify terminating her lease. [Exh. K ¶ 45; Exhs. F and X]; *see Johnson*, 145 F. Supp. 3d at 920 (equity greatly favored tenant where she did not materially violate the lease, she did not miss rent, and she was not untimely in paying her rent). Instead of hardship, Defendants would benefit from Saint Patrick's continued occupation of her home because it would eliminate any need or costs associated with finding a replacement tenant. Injunctive relief would merely preserve the status quo and allow Saint Patrick to continue paying RHI and Mark-Taylor rent, as she has for the last five years. So, equity favors the Court granting an injunction in this case.

**D. Public Policy Strongly Favors Preventing FHA Violations**

"[I]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. "The public interest has been authoritatively declared by Congress in its enactment of the FHA." *Gonzalez v. Recht Family Partnership*, 51 F. Supp. 3d 989, 992 (S.D. Cal. 2014) (internal quotations omitted).

Saint Patrick seeks a TRO and preliminary injunction to enjoin Defendants' violations of the FHA. The FHA forbids discrimination and intimidation with respect to housing rights as a

member of a protected class. 42 U.S.C. §§ 3604(f)(1), 3617. To protect Saint Patrick's rights, an injunction is necessary. Otherwise, not granting an injunction would sanction Defendants' discriminatory decision to evict her. It would also go against public policy to allow another disabled veteran to become homeless.

## CONCLUSION

Every factor for a TRO and preliminary injunction weighs heavily in favor of granting equitable relief in this case. An injunction is necessary so Saint Patrick is not homeless when her lease expires on April 13, 2022 and she is forced to pay 20% more in rent. She has presented evidence to show she will likely be successful on the merits in this case because of Defendants' discriminatory conduct. The relative hardships on the parties show Saint Patrick would be greatly harmed without an injunction and Defendants would suffer no apparent harm if one were granted. And public policy favors enforcement of the FHA. Therefore, the Court should issue a TRO without delay, and a preliminary injunction after hearing from the parties.

DATED this 7th day of April 2022.

DESSAULES LAW GROUP

By: /s/ Douglas M. Imperi, Jr.
Jonathan A. Dessaules
Douglas M. Imperi, Jr.
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 7, 2022 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and for transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

Colin L. Clark
LAW OFFICES OF SCOTT M. CLARK, PC
4222 E. Thomas Road, Ste. 230
Phoenix, Arizona 85018
colin@scottclarklaw.com
*Attorney for Defendants*

/s/ Hilary L. Narveson